UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORENZO ANTHONY

Plaintiff,

Case No. 4:03-cv-87

v

Hon. Wendell A. Miles

LEE GILMAN and ANNE MICHELIN
in their official and individual capacities,

Defendants.
______________________________/

OPINION AND ORDER ON PLAINTIFF'S MOTION FOR NEW TRIAL

The plaintiff in this action is a Michigan prisoner who asserted claims under 42 U.S.C. § 1983 against current and former Michigan corrections officials who are or were employed at the Ionia Maximum Correctional Facility ("IMAX"). Plaintiff alleges that he was subjected to cruel and unusual punishment when he was restrained to his bed for a seven-day period and also denied bathroom breaks from the restraints during that period. The matter was ultimately tried to a jury during a two-day period beginning on December 5, 2005. The jury returned a verdict in favor of the two remaining defendants, Lee Gilman and Anne Michelin. The court entered judgment on December 7, 2005.

The matter is currently before the court on plaintiff's motion for new trial as to his claim against one of the defendants, Lee Gilman (docket no. 219).[1] Defendant Gilman has opposed the

[1] Plaintiff is not seeking a new trial as to defendant Anne Michelin. Brief in Support of (continued...)

motion.[2] For the following reasons, the court **DENIES** the motion.

**I**

In December, 2002, plaintiff was incarcerated at IMAX. At the time, IMAX was known as a "Level 6" facility, or "Supermax," meaning that it housed the worst of the worst offenders in terms of security. Plaintiff was, at the time, housed in Unit 2 of IMAX, a detention unit used to house prisoners who had been placed under detention for misconduct. Evidence presented at trial showed that plaintiff had an extensive prison disciplinary record which included a number of instances of assaults or threats of assault on corrections employees.

On December 3, 2002, corrections officers in Unit 2 discovered that plaintiff had removed from his cell wall an electrical outlet plate containing metal parts. After a search of his cell and person, plaintiff ultimately admitted to having removed the outlet plate, which he had apparently broken into pieces at some point in removing it from the wall. Although plaintiff claimed to have given all of the metal parts to the officers when asked to do so, plaintiff was

[1](...continued)
Plaintiff's Motion for New Trial at 3 n.1.

[2]After defendant Gilman filed his response in opposition to the motion, plaintiff filed a reply brief. Local rules provide that reply briefs in support of non-dispositive motions may not be filed without leave of court. W.D. Mich. L.Civ.R. 7.3(c). Because motions for new trial are not specified as dispositive, they are considered non-dispositive. W.D.Mich. L.Civ.R. 7.3(a); 7.2(a). The court has reviewed the contents of plaintiff's reply notwithstanding its having been filed in violation of the rules. The reply raises no new issues and merely re-argues the same issues raised in plaintiff's original supporting brief.

accused of secreting some of the broken metal.[3] Despite plaintiff's insistence that he had no more metal, plaintiff was told that he would be placed in top-of-bed ("TOB") restraints until any missing metal was retrieved.

It is undisputed that defendant Gilman, who was at the time deputy warden at IMAX, ordered plaintiff to be restrained to his bed in "hard" restraints for seven days, from December 3 to December 10, 2002, and that plaintiff was in fact so restrained. At trial, defendant Gilman testified that he authorized plaintiff's placement in TOB restraints because he was informed by corrections officials that metal was missing from plaintiff's cell and that plaintiff would not disclose the location of the missing metal. Gilman testified that he feared that plaintiff might have swallowed the metal, with the intent of later retrieving it from his waste. Gilman also testified that he feared that if plaintiff retrieved the metal, he could use it as a weapon to stab or otherwise harm either plaintiff himself or someone else, such as a guard or another prisoner.

Placement in hard TOB restraints meant that plaintiff's legs were chained and padlocked to his bed. An inmate placed in TOB restraints is severely restricted in his movements, but has some ability to move while in bed. Inmates placed on TOB restraints are checked daily by prison medical staff. They are also given their meals, as well as breaks during which they are allowed off the bed to stretch or use the bathroom, or -- on occasion -- to shower. Testimony at

---

[3]In his pleadings, plaintiff alleged that he told an MDOC sergeant "that he [plaintiff] had turned over all of the pieces of metal from the outlet plate, and that if pieces appeared to be missing, it was only because they were broken up and not properly assembled." Second Amended Complaint (docket no. 131) at 3, ¶ 16.

trial indicated that bathroom breaks from TOB restraints require the presence of four male corrections officers and use of a video camera. Medical checks, breaks, meals, and showers – as well as an inmate's refusals of breaks, meals, or showers – are recorded on what is known as a "door card" posted at the door of the inmate's cell. (The door card for plaintiff's cell during the period in question was admitted at trial as Defendants' Exhibit 2.)

Before trial, the parties stipulated that it takes "the average person" 72 hours -- three days -- or less to pass metal through his digestive system. This stipulation was read to jurors during the trial. Notwithstanding this stipulation, Gilman testified at trial that he authorized plaintiff's restraints for a period exceeding three days because he was concerned about the possibility of plaintiff "recycling" the metal by ingesting it, recovering it from his own fecal matter, and then re-ingesting it. Gilman testified that in his experience, an inmate who is intent on "recycling" contraband in his waste will refuse bathroom breaks because he knows he will be watched during these breaks, thus leaving no opportunity for the inmate to recover any metal from the contents of a toilet bowl.

Also at issue during the trial, though not the subject of the current motion, was plaintiff's claim against defendant Anne Michelin, a resident unit officer at IMAX. As part of his complaint, plaintiff alleged that "[a]t several points" during the seven-day period while he was in TOB restraints, he requested to be removed from his chains so that he could use the toilet. According to plaintiff, each of the employees to whom he made these requests – including Michelin – denied them. As a result, plaintiff alleged, he was forced to urinate and defecate in

his bed, where he lay in soiled sheets for seven days.

Michelin testified that she worked on plaintiff's "rock" in Unit 2 on December 7, 2002. In doing so, she had regular contact with plaintiff, providing him with food and water as well as offering him four breaks during her eight-hour shift. Michelin testified that plaintiff refused each of her four offers of breaks and that she recorded these refusals on the door card. Michelin also testified that she was accompanied by another corrections officer -- a male officer -- each time she entered plaintiff's cell, and that at no time during her shift did plaintiff request that either officer provide him with a bathroom break. Michelin further testified that as a female officer, she could not herself have given plaintiff a bathroom break; had plaintiff requested a break, she would have reported it to a male officer so that the usual procedure for TOB breaks (including four male officers and a video camera) could be followed.

Before trial, the parties also stipulated that no metal was ever recovered from plaintiff even though he was removed from TOB restraints after a seven-day period. This stipulation was also read to the jury as part of the jury instructions at the conclusion of the trial. Gilman testified that he ultimately authorized removal of the restraints because he realized that the restraints had ceased serving their purpose.

For their deliberations, the jurors were provided with a special verdict form in which they were requested to answer the following questions relevant to the present motion:

> 1. Do you find by a preponderance of the evidence that defendant Lee Gilman violated plaintiff’s constitutional rights under the Eighth Amendment by keeping the plaintiff on top-of-bed restraints solely for the purpose of punishing him?

* * *

> 3. Do you find by a preponderance of the evidence that defendant Anne Michelin violated plaintiff's constitutional rights under the Eighth Amendment by refusing his request to use the bathroom?

The jurors returned the special verdict by answering each of these questions in the negative.

**II**

Plaintiff argues that he is entitled to a new trial on his claim against defendant Gilman because the jury verdict was against the great weight of the evidence. Where a motion for new trial is made on such grounds,

> A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable. Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper.

Barnes v. Owens-Corning Fiberglass Corp., 201 F.3d 815, 820-21 (6th Cir. 2000) (internal quotations omitted). "A district court ruling on a motion for new trial 'must compare the opposing proofs, weigh the evidence, and set aside the verdict only if it determines that the verdict is against the clear weight of the evidence.'" McDonald v. Petree, 409 F.3d 724, 727 (6th Cir. 2005) (citation omitted). The court "should not grant a motion for new trial merely because different inferences and conclusions could have been drawn or because other results are more reasonable." Id. at 728 (internal quotations omitted).

In support of his motion, plaintiff argues that the great weight of the evidence which he presented at trial demonstrated that Gilman violated his constitutional rights because he ordered

plaintiff to be placed in TOB restraints for an entire week in order to "punish" plaintiff – apparently for previous bad behavior – instead of to address any security risk posed by missing metal.

"After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment." Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 1084 (1986) (some internal quotations omitted). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 2399 (1981) (citations omitted).

"Ensuring security and order at the institution is a permissible nonpunitive objective[.]" Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 1886 (1979). "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights" of convicted prisoners. Id., 99 S.Ct. at 1878. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel[.]" Id. "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions[,]" and therefore prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. That deference extends not only to prison security measures taken in response to actual confrontation with unruly inmates but also "prophylactic or preventive measures" intended to reduce the incidence of any breaches of prison discipline. Whitley, 106 S.Ct. at 1085. The infliction of pain in the course of such a prison security measure "does not amount to cruel and unusual punishment simply because it may appear in retrospect

that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id. at 1084.

Whether a prison security measure has inflicted unnecessary and wanton pain and suffering "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. (citation omitted). The use of restraints may, under certain circumstances, violate the Eighth Amendment. See Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2514 (2002) (chaining shirtless inmate to outdoor "hitching post" in standing position with arms raised for seven-hour period with minimal water and no bathroom breaks violated the Eighth Amendment, where safety concerns had abated and no emergency situation was presented). However, the use of TOB restraints does not necessarily amount to the unnecessary and wanton infliction of pain. See Hartsfield v. Vidor, 199 F.3d 305, 310 (6th Cir. 1999) (placement in hard TOB restraints for 18 hours was not cruel and unusual punishment, where testimony and documentation showed that plaintiff was allowed adequate toilet breaks and water); see also Williams v. Vidor, 17 F.3d 857, 859 (6th Cir. 1994) (court could not conclude that use of TOB restraints violated Eighth Amendment as a matter of law). This is particularly true where the restraints are justified by a security concern.

According to plaintiff, Gilman's actions in requiring the restraints to be maintained beyond 72 hours – the length of time the parties stipulated it would take the "average person" to pass metal through his digestive system – makes Gilman's explanation of a security risk implausible. Plaintiff also argues that Gilman offered no explanation for why prison officials did not x-ray plaintiff or look through plaintiff's feces to locate the missing metal, and that therefore

Gilman acted in a manner which was inconsistent with a claimed security justification for ordering the restraints.

"It cannot be questioned that the body cavities of prisoners are capable of secreting a surprising array of objects, and that inmates are willing to go to extreme lengths to obtain weapons[.]" United States v. Oakley, 731 F. Supp. 1363, 1370 (S.D. Ind. 1990) (citations omitted), aff'd, 944 F.2d 384 (7th Cir. 1991). Notwithstanding the parties' stipulation that "[i]t takes the average person 72 hours or less to pass metal through his or her digestive system[,]" Final Pretrial Order at 2, ¶ 2(b), jurors need not have found that plaintiff would certainly have eliminated any swallowed metal within 72 hours. One possibility which cannot be discounted, notwithstanding the parties' stipulation, is that plaintiff did not experience what the "average person" having swallowed metal would have experienced. In other words, the possibility exists that plaintiff did swallow metal and that it remained lodged in his digestive system for a period longer than 72 hours or even longer than the one-week period during which he was restrained.[4] Another perhaps more likely possibility is that plaintiff simply excreted in his fecal matter any metal that he had swallowed. The metal would then have simply been flushed down the toilet. Although plaintiff testified that he was not given bathroom breaks while he was on TOB restraints, and he presented testimony of other inmates which ostensibly corroborated his claim that he was denied breaks, no evidence was presented that anyone – either employee or prisoner – ever complained of the smell which would likely have been present in the unit if plaintiff had

[4]In one instance, an inmate ingested a razor blade which remained in his abdomen for a period in excess of 18 months; it was eventually removed surgically. Corsetti v. California Dept. of Corrections, No. C 00-1616 SI (PR), 2001 WL 253216 (N.D. Cal. 2001).

been denied bathroom breaks for a period of seven days.[5] Finally, another possibility which cannot be discounted – given plaintiff's previous behavior which the evidence showed included incidents of handling his own waste – was the possibility considered by Gilman: that plaintiff excreted and re-ingested the metal while he was alone in his cell restrained to his bed.

Plaintiff's argument that Gilman's explanation of security concerns for ordering the TOB restraints was not plausible because Gilman did not order that plaintiff be x-rayed or that guards search plaintiff's feces are not persuasive. It would not have been reasonable for Gilman to order his officers to comb through an inmate's feces, particularly where the metal was likely to be excreted and flushed down the toilet in the presence of four prison guards. The guards' presence during bathroom breaks would have given plaintiff little opportunity to retrieve his feces from a toilet bowl and to attempt to further conceal any metal. In addition, there was no evidence that plaintiff complained of medical problems which would have warranted his being transferred from detention for an x-ray. Moreover, even assuming that Gilman could have somehow ordered prison medical personnel to procure an x-ray of plaintiff's intestines in the absence of any medical necessity (authority which Gilman denied having), it was not unreasonable for Gilman to wait for a period of time before checking into the possibility of a medical resolution to any security concerns. Jurors could reasonably have found that seven days in TOB restraints was not an exaggerated response to a security risk posed by missing metal, particularly in view of evidence that plaintiff was given access to medical care, bathroom breaks, and life's necessities during that period.

---

[5]The jury's verdict as to defendant Michelin provides some confirmation that the jurors did not credit plaintiff's or his witnesses' testimony regarding plaintiff having been denied bathroom breaks.

Plaintiff further argues that the fact that Gilman ultimately ordered plaintiff released from the restraints without determining what had actually happened to the metal is inconsistent with Gilman's claim of concern regarding a security risk. However, this argument is essentially the same as plaintiff's other arguments, which are based on the assumption that Gilman should have (1) ordered guards to retrieve and comb through any stool plaintiff produced during bathroom breaks, and/or (2) ordered prison medical personnel to medically determine (either through x-ray or otherwise) whether the contents of plaintiff's intestines contained metal. However, it was reasonable for the jury to determine, based on the evidence and their own common sense experiences, that any risk posed to others by plaintiff's having swallowed metal would dissipate over time, because of an increasing likelihood that the metal would eventually be flushed down the toilet. At some point, Gilman recognized, there came to be little reason to continue to maintain the restraints. The jury could reasonably conclude that Gilman did not act in violation of plaintiff's rights by ordering the restraints maintained for a seven-day period until any risk was more fully dissipated.

Finally, plaintiff also argues that defendant Gilman's explanation for ordering the TOB restraints as a security measure is impeached by pretrial testimony given by defendant Michelin. Plaintiff argues that during her deposition taken during discovery, Michelin testified that TOB restraints were a form of "discipline" used on prisoners at IMAX. Plaintiff seemingly equates "discipline" with "punishment," and argues that Michelin's pretrial "admission" supports plaintiff's position that the restraints were used solely as "punishment" in this instance. However, although "punishment" is one possible meaning of the word "discipline," another common meaning of "discipline" is conduct within the rules, which is how the term is used in the

relevant case law. See, e.g., Whitley, 106 S.Ct. at 1085 ("maintain or restore *discipline*") (emphasis supplied); Bell, 99 S.Ct. at 1878 (emphasizing importance of "internal order and *discipline*") (emphasis supplied). At trial, Michelin explained that she did not mean that TOB restraints were used as punishment. In addition, and more importantly, Gilman – whose state of mind is relevant to the present motion, see Whitley, 106 S.Ct. at 1085 (relevant factor in assessing use of force in prison setting is "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them") – never admitted that he used the restraints as "punishment."

In any event, whether the jury's verdict is allowed to stand does not depend on what Michelin meant in her deposition testimony. The court may grant a new trial as to defendant Gilman only if the verdict in his favor is unreasonable and against the clear weight of the evidence. Here, the jury acted rationally, and their verdict was reasonable. Plaintiff is not entitled to a new trial simply because the jury could have reached a different conclusion.

## Conclusion

**Motion denied.**

So ordered this 26th day of January, 2006.

/s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge